UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| William B. Cox, Personal Representative for the Estate of Robin C. Flemming, | ) ) ) | Civil Action No.: 4:13-cv-01456-BHH |
| | ) | |
| Plaintiff, | ) ) | **Opinion and Order** |
| vs. | ) | |
| | ) | |
| Duke Energy, Inc., Darlington County Sheriff's Office, Darlington County Sheriff J.W. Byrd, Gary Streett, Joyce C. Everett, and William "Randy" Gideon, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

This matter is before the Court on the motion of the Defendants Duke Energy, Inc.,[1] and William "Randy" Gideon (collectively the "Duke Defendants") for summary judgment (ECF No. 135) and on the motion of Defendants JW Byrd, Joyce C. Everett, Gary Streett, and the Darlington County Sheriff's Office (collectively the "Darlington Defendants") for summary judgment (ECF No. 141). For the reasons set forth below, the Court grants the motions for summary judgment.

## BACKGROUND

The Plaintiff in this case is William B. Cox, who is acting as the personal representative of the Estate of Robin C. Fleming. On October 10, 2013, Plaintiff was substituted for Mr. Fleming, who sadly passed away from cancer on July 3, 2013. (*See*

---

[1] Defendants maintain that this party is more properly identified as Duke Energy Progress, Inc., and Plaintiff has not contested the correction. The Court will refer to this entity as "Duke."

ECF Nos. 29 & 31.) This case arises out of the July 26, 2012 arrest of Mr. Fleming, a then 70 year-old retired aeronautical engineer and commercial glider pilot, by officers of the Darlington County Sherriff's Office. Mr. Fleming was ordered to land at the Hartsville Airport and arrested after he flew his glider over a nuclear power facility and circled in a nearby area.

The H.B. Robinson nuclear power plant (the "Robinson Plant") is a nuclear facility located in Hartsville, S.C., near Lake Robinson. The Robinson Plant is operated by Duke Energy Progress, Inc., a regulated public utility that generates, transmits, distributes, and sells electricity in North and South Carolina. (Am. Answer ¶ 2, ECF No. 124.) Nuclear facilities, like the Robinson Plant, are licensed by the Nuclear Regulatory Commission (NRC), which comprehensively regulates their security. (*See id.* at ¶ 26; 10 C.F.R. § 73.55.) The Duke Defendants submitted documents, including several submitted under seal, showing that the agency monitors the security of the Robinson Plant and provides guidance addressing a range of potential threats, including those related to aviation. (*See, e.g.*, ECF No. 167 (sealed documents filed in support of Duke Defendants' motion for summary judgment).)

Mr. Fleming's July 26, 2012 flight originated at "Bermuda High Soaring," a soaring airfield and flight training facility located in Lancaster County, near Jefferson, South Carolina. (Fleming Dep., ECF No. 135-5 at 25:1-4.[2]) Mr. Fleming intended to fly from Bermuda High Soaring to Asheboro, North Carolina, then to Dillon, South Carolina, then to Winnsboro South Carolina, and then back to Bermuda High. (*See* ECF No. 135-

---

[2] Because the parties have broken various depositions into *numerous* exhibits, in most instances, the Court cites the record using the docket numbers for each exhibit rather than the document names. Pin cites are to ECF pagination, except for citations to depositions, where the original page and line numbers are used.

8 at 1.) Mr. Fleming left Bermuda High Soaring at 12:41 p.m., but the weather conditions were not conducive to his original flight plan, and just after 4:00 p.m., while in the vicinity of Darlington, South Carolina, he decided to return to Bermuda High Soaring. (*Id.*) He proceeded north of Hartsville and then headed southwest toward Lake Robinson in an attempt to find a thermal pattern that would allow him to gain altitude. (*Id.*) It was at this point that he passed over the Robinson Plant. (*Id.*)

According to Mr. Fleming, his glider made a single pass over the facility, but did not fly directly over the dome of the reactor. (*See* ECF No. 144-25 at 37:5-38:25 (describing the flight path).) An examination of the flight recorder in his glider confirmed this testimony and indicated that the glider remained in an excess of 1,000 feet over the facility as it made its pass. (*See* ECF No. 144-11 at ¶ 9; ECF No. 144-26 (illustration showing the horizontal flight trace from Fleming's flight recorder).) The glider's pass over the Robinson Facility lasted less than two minutes, and it proceeded several miles away from the plant toward the east side of Lake Robinson where it slowly gained altitude by a normal mode of flight for a glider, which involved circling or "thermalling" "in a rising column of air, much the way a buzzard constantly turns to stay aloft on a summer day." (ECF No. 144-11 at ¶¶ 10-11.)

It does not appear that, at any time relevant to this case, there were any FAA-imposed airspace restrictions over or around the Robinson Nuclear Plant, or anything that could accurately be described as a "no-fly zone". (ECF No. 144-10 at ¶ 5, ECF No. 144-11 at ¶¶ 6-7.) Nor does it appear from the record that Mr. Fleming violated any FAA regulations during his flight on July 26, 2012. (ECF No. 144-11 at ¶ 5.) The FAA had issued a Notice to Airmen (NOTAM), which read as follows:

> In the interest of national security and to the extent practicable, pilots are strongly advised to avoid the airspace above, or in proximity to such sites as power plants (nuclear, hydro-electric, or coal), dams, refineries, industrial complexes, military facilities and other similar facilities. Pilots should not circle as to loiter in the vicinity over these types of facilities.[3]

Mr. Fleming was aware of this NOTAM on July 26, 2012; however, he and Plaintiff's expert witnesses characterize the NOTAM as "advisory" and maintain that thermalling, the means by which a motorless glider climbs and maintains altitude, should not be considered "loitering." (ECF No. 144-34 at 78:12-79:13; ECF No. 144-11 at ¶ 12.) Plaintiff also submitted some evidence suggesting that the FAA has clarified that thermalling is not the same as "loitering." (*See* ECF No. 144-10 at ¶¶ 10-11; ECF No. 144-11 at ¶¶ 12-13.) For purposes of these summary judgment motions, the Court assumes that Mr. Fleming's flight was legal, and the evidence largely supports that conclusion.

Security personnel employed by Duke at the Robinson Plant observed Mr. Fleming's glider pass over the facility and then begin to circle in a nearby area. The security personnel considered the continued presence of the aircraft in the vicinity of the plant to be suspicious, and initially believed that the glider was a drone. (ECF No. 135-3 at 106:23-107:20, 164:25-165:14; ECF No. 135-4 at 42:11-13, 45:14-17.) They contacted local law enforcement and the local airport, and also spoke with the Federal Aviation Administration ("FAA") and Shaw Air Force base ("Shaw") regarding the suspicious aircraft. (ECF No. 135-3 at 129:5-10, 154:8-12; ECF No. 135-4 at 22:7-23:17, 35:18-24; ECF No. 135-9.) Neither the FAA nor Shaw could pick up the aircraft by radar. (ECF No. 135-11 at 11:5-15; ECF No. 135-4 at 23:18-25; ECF No. 135-10 at 81:4-17.)

---

[3] *See* FAA National Flight Data Center, Special Notice 4/0811 ("Notice to Airmen").

The arrest warrant alleges that Mr. Fleming flew "very close to the nuclear plant dome in a 'no-fly zone.'" (ECF No. 144-7.) Various Duke employees have given estimates of Mr. Fleming's altitude that are inconsistent with the records from the flight recorder. In one of the most extreme instances, the assistant manager of the Hartsville Airport reported that Duke security personnel "stated that the glider had flown only 100 feet above the dome of the reactor …." (Aff. of Wendy Griffin ¶ 11, ECF No. 144-2.) It is not entirely clear what the Duke Defendants conveyed to the Darlington Defendants regarding Mr. Fleming's altitude, but construing, as it must, the facts in the light most favorable to the non-moving party, the Court assumes that the report did not precisely or accurately relay the Mr. Fleming's true altitude and that the Duke Defendants reported to the Darlington Defendants that Mr. Fleming had flown very close to the dome of the reactor.

Law enforcement also appears to have been operating under the inaccurate assumption that the airspace in and around the Robinson Plant was a restricted "no-fly zone." It is not entirely clear where the Darlington County Sherriff's Office got this idea. Plaintiff has speculated that the Duke Defendants and their agents also held this inaccurate belief and have suggested that they conveyed it to law enforcement. However, there is only the most speculative evidence that anyone from Duke actually held this belief. (*See* ECF No. 144-20 at 3 (Sheriff Byrd implying in a news interview that Duke and local and federal officials shared a false assumption that the airspace over the plant was restricted[4]).) Plaintiff has not directed the Court to any evidence that

---

[4] The assumption that the Duke Defendants believed that the airspace over the Robinson Plant was restricted is called into question by testimony indicating that airplanes and even gliders regularly flew over the Robinson Plant without incident. (*See* Reid Dep. 39:13-40:3, ECF No. 144-52 (testifying that flights regularly flew over the Robinson Plant).) According to Duke, it was Mr. Fleming's flight pattern and

anyone from Duke made this claim to local law enforcement.[5] Numerous witnesses denied hearing anyone from Duke convey to state law enforcement that there was a "no-fly zone" over the Robinson Nuclear facility or that Mr. Fleming had flown into a "no-fly zone." (*See* ECF No. 144-6 at 169:2-22; ECF No. 144-30 at 169:2-10.) Additionally, Mr. Fleming denied hearing anyone from Duke assert that he had entered a "no-fly zone" or otherwise mention a "no-fly zone." (ECF No. 135-5 at 55:17-24.) Indeed, when asked about how he and his deputies came to believe that the airspace over the Robinson Nuclear Plant was restricted, Sherriff Byrd testified as follows:

proximity to structures in the plant that caused his flight to be reported as suspicious, not the mere fact that he flew in the area around the Robinson Plant. (*See* ECF No. 144-30 at 90:8-93:21.)

[5] Plaintiff explicitly alleges that Duke reported to the Sheriff that Fleming had "infiltrated a no-fly zone" over the facility. In support of this claim, Plaintiff cites (1) the Amended Complaint at ¶¶ 23-24, (2) the Deposition of Tim Robertson at 168-169, (3) the arrest warrant, (4) the Sherriff's Reports, and (5) the Deposition of Sheriff Byrd at 90-92, 74, 96, 131, and 122. "Allegations contained in a complaint are not evidence, and cannot defeat a motion for summary judgment." *See, e.g.*, *Cambridge Capital Group v. Pill*, 20 Fed. Appx. 121, 124-25 (4th Cir. 2001) (unpublished). The cited portions of the Robertson Deposition do not support Plaintiff's claim. Mr. Robertson was specifically asked, "[s]o did anyone at Duke Energy, to the best of your knowledge, tell the Darlington County sheriff that the glider was in a no-fly zone," and his answer was "No." (ECF No. 144-6 at 169:2-5.) The arrest warrant and incident report prepared by the Darlington County Sheriff's Office both indicate that Mr. Fleming flew through restricted airspace or a "no-fly zone," but neither attribute this claim to anyone from Duke. (*See* ECF No. 144-7; ECF No. 144-8 at 4.) Finally, the Court has reviewed the cited pages from Sheriff Byrd's deposition, which do not directly support Plaintiff's allegation that someone from Duke said there was a "no-fly zone" over the Robinson Plant, but rather indicate that the Sheriff and his deputies reached this conclusion as a matter of "common sense." In summary, the Court cannot find any direct evidence that "Duke called the Darlington County Sheriff to report that Mr. Fleming's glider … had 'infiltrated a no-fly zone' over the facility," as Plaintiff has claimed. (ECF No. 144 at 2-3.) It is one thing for a party to argue that a sequence of events or statements create an inference that information came from a particular source, but it is quite another to attribute language with quotation marks around it to a source where there is no direct evidence that the statement was made by that source and to send the Court on a wild-goose chase looking for evidence that does not exist in any form close to that suggested in the briefing. A citation without an introductory signal and explanatory parenthetical is understood to assert that the cited authority "(i) directly states the proposition, (ii) identifies the source of a quotation, or (iii) identifies an authority referred to in the text." *The Bluebook: A Uniform System of Citation* (19th ed. 2010) at R.1.2. Plaintiff's oversight is particularly ironic given the harsh accusations it levels regarding the Duke Defendants' recitation of facts. (*See, e.g.*, ECF No. 144 at 1 ("Dukes recitation of the facts in this case as enumerated in their memorandum of law are replete with self-serving statements of what Duke would like the facts to be, but in reality represent a one sided view of the case that does not comport with the record as a whole.").)

> Q. So how did you or your deputies come to believe that there was this restricted airspace over the nuclear plant?
>
> A. I think that was an assumption that we arrived at based on what we considered common sense and the national response since 9/11.

(ECF No. 144-16 at 96:10-13.)

After receiving the report from Duke, the Darlington Defendants engaged in what can only be described as a heavy-handed response. As many as seventeen (17) vehicles carrying local law enforcement and two police dogs converged on the Hartsville Airport. (Aff. of Wendy Griffin ¶ 10, ECF No. 144-12.) Deputies of the Darlington County Sheriff's office advised the airport's assistant manager, Wendy Griffin, that they were "commandeering the airport" and requested that she order Mr. Fleming's glider to land. (*Id.* at ¶¶ 3-4; ECF No. 144-38 at 259:2-5.) Ms. Griffin responded that she did not have the authority to order the pilot of the glider to land as such authority belonged exclusively to the FAA. (ECF No. 144-12 at ¶ 4.) Although she believed that she lacked the authority to give the requested order, Ms. Griffin "felt coerced by law enforcement to cooperate," and she conveyed the instruction to Mr. Fleming to land his glider. (*Id.* at ¶¶ 5-7.)

An incident report from the Darlington County Sherriff's Office indicates that "officials from the H.B. Robinson Nuclear Plant also arrived on the scene at the airport," but it does not indicate what role, if any, these officials played. (ECF No. 144-8.) Ms. Griffin indicated that Duke security personnel arrived, told her that the aircraft had flown a hundred feet over the dome of the reactor and that they wanted to shoot the aircraft down. (ECF No. 144-12 at ¶ 11.) This Duke employee also allegedly told Ms. Griffin that an armed helicopter had been deployed from Chesterfield County. (*Id.*) Despite these

statements, there is absolutely no evidence that anyone from Duke ever attempted to shoot at Mr. Fleming's glider or that any steps were taken by Duke to seek authorization to shoot at the glider. Moreover, it appears from the record that the helicopter allegedly referenced belonged to Chesterfield County law enforcement, and not to Duke. (*See* ECF No. 135-9, ECF No. 144-32 at 60:2-24.)

Although he did not believe that he had entered any restricted airspace or otherwise violated the law, Mr. Fleming decided to comply with the instruction and land his glider. (ECF No. 135-5 at 80:1-11.) Once on the ground he cooperated with law enforcement and explained that there was no restricted airspace corresponding to the Robinson Plant on his flight charts. Although these claims were apparently corroborated by Ms. Griffin's response to law enforcement and by statements made to Sheriff's deputies by a helicopter pilot for Chesterfield County, (*see* ECF No. 144-12 at ¶ 12), Mr. Fleming was, nevertheless, arrested by Darlington County Sheriff's deputies and charged with a breach of the peace, a misdemeanor.[6]

There is substantial evidence in the record that the Darlington County Sheriff's Department, and not the Duke Defendants, made the decision that Mr. Fleming should be arrested. Captain Joyce Everett of the Darlington County Sheriff's Office testified:

Q. Was Mr. Fleming arrested for Duke Energy?

A. I don't know anything about that, him being arrested for someone else. The sheriff's office doesn't arrest for – this is for us. I don't know about nobody else.

Q. Did anyone from Duke ask the sheriff's office to arrest or detain Mr. Fleming?

---

[6] Additionally, Plaintiff maintains that the arrest warrant was defective because it indicates that a particular officer personally appeared before a magistrate, when the facts indicated that the warrant was prepared and signed by an officer who was not even on duty on July 26. (*See* ECF No. 153 at 9-10.)

A. Not to my knowledge. That ain't the way the sheriff's office works.

…

Q. You weren't asked by H.B. Robinson personnel to do anything with regard to this incident, correct?

A. I wasn't.

(ECF No. 135-11 at 86:19-87:8; 91:25-92:2.)

Captain Gary Streett, also of the Darlington County Sheriff's Office, testified that he made the decision to instruct one of his officers to direct Mr. Fleming to land at the Hartsville Airport. (*See* ECF No. 135-10 at 21:8-12). He also made the decision that Mr. Fleming should be arrested:

Q. Did you make the determination to arrest Mr. Fleming?

A. I did.

…

Q. In your training with Duke power, is there anything in that training that indicates how long you should hold something [sic] that you have questions about?

A. No. …holding someone …that we have questions about is normally not a Duke power decision. That's our decision. That's a law enforcement matter. Duke power's concerned with the security and protection of that reactor and their personnel. …

…

Q. …[A]t the time you made the decision to make the arrest, no one from Duke was with you at that point?

A. No.

…

Q. … And the decision to detain him was made by law enforcement again. Is that right?

A. Yes, sir.

Q. …[T]hat was not something that Duke was involved in?

A. No…

…

Q. …[W]hen the warrant, the next day on July 27th was presented to the magistrate judge – who did that?

A. I believe that was Lieutenant Jim Goins.

Q. And there was no one from the Duke side who was present for that that you're aware of?

A. No.

…

(*Id.* at 42:21-23, 52:9-18, 147:12-15, 149:15-20.)

After Mr. Fleming was arrested, Mirandized, and placed in the back of a Darlington County Sherriff's vehicle, a law enforcement officer opened the door and asked if he would answer questions from two individuals that Mr. Fleming believed to be Duke employees. (ECF No. 135-8 at 3) Mr. Fleming responded that "it depended on what the questions were." (*Id.*) The Duke personnel asked Mr. Fleming whether he knew that he was flying over a nuclear plant, and he responded that he did. This was the only question that these individuals asked Mr. Fleming. (*Id.*; Fleming Dep., ECF No. 135-5 at 47:1-17.) Plaintiff also claims that Duke security personnel were allowed to look inside Fleming's glider, however, a photo of the glider reveals that the cockpit is very small, and the entirety of it could be seen by a person standing outside the glider on the runway. (*See* ECF No. 135-7.) There is no evidence that Duke security personnel took anything from the glider and created any type of inventory to turn over to law enforcement.

Mr. Fleming spent the night of July 26 in jail. The next day he was interviewed by agents with the FBI and the Department of Homeland Security, and was released on bond after having spent a total of approximately 24 hours in custody. (*See* ECF No. 135-8 at 4-5.) The breach of the peace charge against Mr. Fleming came up for trial in

the Hartsville Magistrate Court on August 21, 2012. Prior to the trial, Mr. Fleming's defense counsel, Gerald Malloy, a practicing attorney and state senator, advised Mr. Fleming that the charge against him would be dropped if he waived any potential legal claims he might have against Darlington County law enforcement. Mr. Fleming initially resisted the proposal, but after arguing with Mr. Malloy about it for approximately 20 minutes, he decided to follow his attorney's advice. (*See* ECF No. 141-2 at 67:11-68:12.) Mr. Fleming composed the following release, which was written in his handwriting, signed by him, and witnessed by Denise Chavis, an employee of Mr. Malloy's office:

> SUBJECT: CASE # 2012A1610100158
>
> TO WHOM IT MAY CONCERN
>
> I, ROBIN G. FLEMING, ACCEPT DISMISSAL OF THE SUBJECT BREACH OF PEACE AGAINST ME. I ALSO AGREE THAT NO LEGAL ACTION WILL BE TAKEN AGAINST DARLINGTON COUNTY LAW ENFORCEMENT NOW, OR IN THE FUTURE.
>
> SIGNED: Robin G. Fleming

(ECF No. 141-3.)

Mr. Fleming was not in custody at the time he executed the release and had not been in custody since July 27, 2012, the day after he was arrested. (*See* ECF No. 141-2 at 68:16-69:4.) In explaining his reasoning for signing the release, Mr. Fleming testified as follows:

> I signed the document, believing that if I didn't, it would go to a court case. And I would be in front of a series of jurors from the City of Hartsville. And I felt I would have no chance of clearing my name. And then – I would have a record and I would also have to pay a fine. So I elected to sign this document.

(ECF No. 141-2 at 17:6-13.) Mr. Fleming denied that Mr. Malloy had told him that he would go to jail if he failed to sign the release, but said that Mr. Malloy did advise him that it would be in his best interest to sign a release. (Fleming Dep., ECF No. 135-5 at 69:5-15.)

Plaintiff argues that the release should be set aside, in part, because Mr. Fleming learned "only after the release was signed" that "Defendant Byrd had admitted against his interest that his office did not require the release to be signed in consideration for dropping the charges against him." (Pls. Resp. to Darlington Defendants Mot. Summ. J. 5, ECF No. 153.) Plaintiff is referring to a January 17, 2013[7] news article about Mr. Fleming's arrest, which reported as follows: "…Fleming has said that his lawyer had told him outside the closed courtroom that the charges would be dropped if he agreed not to sue the department. [Sheriff] Byrd denied that the prosecuting attorney made this suggestion." (ECF No. 144-20 at 3.) Plaintiff's claim simply does not follow from the language cited in the article. The fact that it was defense counsel who suggested that the case be resolved through a release-dismissal agreement does not mean that the charges would have been dropped in the absence of the waiver. Indeed, while Sherriff Byrd testified that his office did not require Mr. Fleming to sign a release of claims against it in order to drop the charges, he also indicated that the charges would *not* have been dropped in Mr. Fleming's attorney had not offered the release of claims. (*See* ECF No. 144-23 at 184:11-185:19.)

---

[7] The date of the article is significant because it is several months after Mr. Fleming signed the release. There is no evidence to suggest that Sheriff Byrd or anyone else connected to the Darlington County justice system had indicated that charges against Mr. Fleming would be dismissed with or without a release at the time Mr. Fleming signed the release.

Finally, the evidence further suggests that the Duke Defendants had no role in the decision to prosecute Mr. Fleming for breach of the peace. Captain Streett testified as follows:

> Q. And at the time that the case was to go forward for prosecution on August 21, to your knowledge, there was no one from Duke present to – to make that case?
>
> A. The only one present that day that I know of was myself, Captain Everett and Senator Malloy.
>
> Q. And none of them were from Duke?
>
> A. No.

(ECF No. 135-10 at 150:21-151:3.) Plaintiff has not directed the Court to any contrary evidence indicating that the Duke Defendants contributed in any way to the decision to charge Mr. Fleming.

## STANDARD OF REVIEW

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other

materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Under this standard, the existence of a mere scintilla of evidence in support of the non-moving party's position is insufficient to withstand a summary judgment motion. *Anderson*, 477 U.S. at 252. Conclusory allegations or denials, without more, are likewise insufficient. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

## <u>DISCUSSION</u>

### I.     <u>Claims Against the Darlington Defendants</u>

Although the Darlington Defendants move for summary judgment on numerous grounds, the Court concludes that all the claims against them should be dismissed

because Mr. Fleming executed a valid waiver of his rights to sue them in connection

with his arrest. While acknowledging that release-dismissal agreements had the

potential for abuse, the Supreme Court in *Town of Newton v. Rumery*, 480 U.S. 386

(1987), rejected the argument that this potential for abuse rendered such agreements

*per se* unenforceable. The Court reasoned that, "[i]n many cases a defendant's choice

to enter into a release-dismissal agreement will reflect a highly rational judgment that

the certain benefits of escaping criminal prosecution exceed the speculative benefits of

prevailing in a civil action." *Id.* at 394. Justice O'Connor, who provided the Court's

critical fifth vote, concurred, writing separately to clarify that it was the defendant's

burden to "prove" that the release in question "was voluntarily made, not the product of

prosecutorial overreaching, and in the public interest." *Id.* at 401 (O'Connor, J.,

concurring). Justice O'Connor also set forth a list of factors to be considered in

determining whether to set aside a release-dismissal agreement, including:

> (1) the knowledge and experience of the criminal defendant;
> (2) the nature of the criminal charges;
> (3) the existence of a legitimate criminal justice objective for obtaining the
> release;
> (4) whether the defendant was counseled; and
> (5) whether the agreement was executed under judicial supervision.

*Id.* at 401-402. The Fourth Circuit has treated these factors as controlling. *See*

*Rodriguez v. Smithfield Packing Co., Inc.*, 338 F.3d 348, 353-54 (4th Cir. 2003).

**A.    The *Rumery* Factors**

**(1) *The Knowledge And Experience Of The Criminal Defendant***

Plaintiff argues that the first factor favors him because, although Mr. Fleming was

a United States citizen, he grew up in the United Kingdom and spent much of his life in

South Africa. (ECF No. 153 at 7.) Furthermore, he had no prior encounters with the

criminal justice system in the United States and consequently lacked relevant knowledge and experience. (*Id.*) However, beginning with *Rumery*, courts that have considered this factor appear to have focused more on the "sophistication" of the accused than on his or her level of experience with the criminal justice system. *See, Rumery*, 480 U.S. at 394 (characterizing the accused as "a sophisticated businessman"); *Poling v. Ferguson*, 878 F. Supp. 880, 882 (N.D. W. Va. 1995) (finding that although the plaintiff was young and lacked a college education, the fact that he was articulate and represented by an experienced defense attorney made up for his "lack of sophistication"); *Berry v. Peterson*, 887 F.2d 635, 640 (5th Cir. 1989) (noting that while the plaintiff and his family had "modest education[s]" "they were all literate"); *Hill v. City of Cleveland*, 12 F.3d 575, 578 (6th Cir. 1993) (contrasting the "sophistication" of the accused with the accused in *Rumery*); *Woods v. Rhodes*, 994 F.2d 494, 499 (8th Cir. 1993) (describing the first factor as "the sophistication of the signer").

Plaintiff has not directed the Court to any specific cases where a court focused primarily or exclusively on the accused's level of experience with the criminal justice system. Indeed, the Court suspects that, in many instances, a party's level of experience with the criminal justice system will be *inversely* correlated with his or her level of sophistication, which is what this factor appears to be primarily concerned with. While Mr. Flemings limited experience with and knowledge of the criminal justice system is relevant, it is easily outweighed by the fact that, by all accounts, he was an accomplished, well-educated man who was capable of weighing the relative advantages and disadvantages of signing the release. Moreover, Mr. Fleming's explanation of his

reasoning for signing the release evinces a logical calculation that it was preferable to waive his right to sue Darlington County law enforcement in order to avoid the risk of a conviction and fine on a minor charge. Accordingly, the Court finds that the first factor favors the enforceability of the release-dismissal agreement.

### (2) *The Nature Of The Criminal Charges*

Regarding the second factor, Plaintiff emphasizes the weakness of the criminal charges against Fleming, arguing that the charges should have been dropped, but were maintained for the improper purpose of coercing Fleming to waive his rights in a civil action. (*See* ECF No. 153 at 10-11.) An evaluation of the strength of the criminal charges is arguably relevant to the overall determination of whether the agreement was "a product of an abuse of the criminal process." *Rumery*, 480 U.S. at 399. However, "the nature of criminal charges" referenced in *Rumery* appears to refer primarily to the severity of the charges brought, not their underlying merit. *See id.* at 401 ("The nature of the criminal charges that are pending is also important, for the greater the charge, the greater the coercive effect.") Here, the charges pending were for breach of the peace, a misdemeanor, reducing substantially the risk that Fleming was unduly coerced to accept the release-dismissal agreement. *See Rodriguez*, 338 F.3d at 354 ("[T]he likelihood that plaintiffs were unduly coerced is particularly small, since they faced only misdemeanor charges."). Thus, the second factor favors the enforceability of the release-dismissal agreement.

### *(3) Existence Of A Legitimate Criminal Justice Objective For Obtaining The Release*

The decision to dismiss the criminal charges in *Rumery* involved criminal justice considerations that are not involved here, namely, sparing the victim of an alleged sexual assault from being required to testify against the defendant, who had been charged with witness tampering for trying to prevent her from testifying against her alleged assailant. *See Rumery*, 480 U.S. at 402-403. While no analogous concerns have been raised here, the *Rumery* Court also added that "sparing the local community the expense of litigation associated with some minor crimes for which there is little or no public interest in prosecution may be a legitimate objective of a release-dismissal agreement." 480 U.S. at 399-400; *see also Rodriguez*, 338 F.3d at 354 n.3 (observing that "the release serves the public interest by sparing Bladen County the expense of future civil litigation"). This case would appear to be exactly the type of "minor" criminal matter where a release-dismissal agreement represents a sensible resolution. Moreover, the Court can hardly attribute to the Darlington Defendants an improper motive to pursue weak charges in order to secure a release-dismissal agreement when it was Mr. Fleming's defense counsel who first suggested that the case be resolved through such an agreement. The third factor favors the enforceability of the release-dismissal agreement.

### *(4) Whether The Defendant Was Counseled*

It is undisputed that Mr. Fleming was represented by counsel at the time he executed the release-dismissal agreement. Plaintiff, however, argues that Mr. Malloy should not have ever been representing Mr. Fleming because he had a conflict of interest due to the fact that he had previously represented Progress Energy, a

predecessor to Duke. Plaintiff fills the record with insinuations of intrigue, but the actual facts are fairly unremarkable. There is no evidence that Mr. Malloy was representing the Duke Defendants at the time he was representing Mr. Fleming, and the Duke Defendants were not prosecuting Mr. Fleming for breach of the peace. If the theory is that Mr. Malloy was acting to protect the interests of the successor of his former client, an obvious question would be why he did not seek to obtain a release for Duke as a part of the deal. It is clear from the record that Mr. Fleming was represented at the time he signed the release-dismissal agreement, and that he drafted and executed it after talking with his counsel about the risks and benefits. Moreover, the Court, can hardly fault Mr. Malloy for negotiating a deal to have the charges against his client dropped, particularly where Mr. Fleming suffered no discernable injury to his person or property during his arrest and spent at most 24 hours behind bars. Plaintiff has not presented the Court with facts that would lead the Court to treat Mr. Fleming as unrepresented or to find that his counsel was ineffective. Again, the Court finds that this factor favors the enforceability of the release-dismissal agreement.

### *(5) Whether The Agreement Was Executed Under Judicial Supervision*

The release-dismissal agreement was not executed under judicial supervision, which does weigh against its enforceability. However, the Court notes that the agreement found enforceable in *Rumery* was not executed under judicial supervision, but that fact was not fatal to the agreement. *See* 480 U.S. at 403 ("While it would have been preferable, and made this an easier case, had the release-dismissal agreement been concluded under some form of judicial supervision, I concur in the Court's judgment . . . that Rumery's § 1983 suit is barred by his valid, voluntary release.").

Though the factor is not specifically addressed, it does not appear that the agreement found enforceable in *Rodriguez* was executed under judicial supervision either. In sum, four of the five *Rumery* factors strongly support the validity of the agreement.

**B.  Other Arguments Against Summary Judgment for Darlington Defendants**

The Plaintiff also argues that he is not bound by the release-dismissal agreement that Fleming signed because the agreement did not specify that it applied to his heirs and assigns. Under South Carolina law, "a personal representative of a decedent domiciled in this State at his death has the same standing to sue and be sued in the courts of this State and the courts of any other jurisdiction as his decedent had immediately prior to death." S.C. Code Ann. § 62–3–703. Accordingly, this Court has held that personal representatives are bound by various waivers signed by or attributable to their decedents. *See, e.g.*, *THI of S. Carolina at Columbia, LLC v. Wiggins*, CA 3:11-888-CMC, 2011 WL 4089435, at *5 (D.S.C. Sept. 13, 2011) ("Thus, [PR] is bound in her capacity as personal representative if [Decedent] would have been bound immediately prior to his death.").

Finally, Plaintiff argues that summary judgment should not be granted because, at the time the motion was filed, Plaintiff had yet to receive discovery responses from Captain Streett, who was added to this case in an amended complaint. (*See* ECF No. 153 at 3-4.) It does not appear that Plaintiff has filed a motion to compel responses to this discovery, and while the Court would typically hesitate to grant summary judgment to a party who failed to comply with discovery obligations, it is clear to the Court that summary judgment is nevertheless warranted. Here, the basis for the Court's ruling in favor of the Darlington Defendants is the release executed by Mr. Fleming, and Plaintiff

20

has not addressed how any of the discovery sought might be relevant to the validity of the release or moved the Court for assistance in obtaining the information. Accordingly, the Court concludes that summary judgment is proper as to the Darlington Defendants.

## II.    Section 1983 Claims Against the Duke Defendants

To state a claim for relief under 42 U.S.C. § 1983, a plaintiff must show that he or she was "deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999). The "under-color-of-state-law" requirement excludes from the reach of § 1983 liability "merely private conduct, no matter how discriminatory or wrongful." *Id.* at 50 (quoting *Blum v. Yaretsky,* 457 U.S. 991, 1002 (1982)). The Duke Defendants argue that Duke is a private entity as opposed to a public entity and that its conduct does not fall within the exception allowing private entities or individuals to be treated as state actors. (*See* ECF No. 135-1 at 9.) Plaintiff does not appear to contest that Duke is a private entity, but argues that the Duke Defendants should be treated like a state actor because of their alleged role in the events in question.

"To implicate 42 U.S.C. § 1983, conduct must be 'fairly attributable to the State.'" *DeBauche v. Trani*, 191 F.3d 499, 506 (4th Cir. 1999) (quoting *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937 (1982)); *see also Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 659 (4th Cir. 1998) ("The central inquiry in determining whether a private party's conduct will be regarded as action of the government is whether the party can be described 'in all fairness' as a state actor."). If the defendant is not a state actor it must "have a sufficiently close relationship with state actors such that

a court would conclude that the non-state actor is engaged in the state's actions." *DeBauche*, 191 F.3d at 506.

Plaintiff directs the Court to a number of allegations which it claims support the contention that the conduct of the Duke Defendants is "fairly attributable to the state." These include: (1) the allegation that law enforcement is trained by the Duke Defendants on how to respond to calls from the Robinson Plant, (2) the allegation that an internal Duke email shows joint efforts with law enforcement to capture and detain Mr. Fleming, (3) the allegation that Duke employees traveled to the Hartsville Airport where Mr. Fleming landed, (4) the allegation that Duke employees participated in directing an employee of the Hartsville Airport to instruct Mr. Fleming to land, (5) the allegation that Duke employees photographed or inspected Mr. Fleming's glider, and (6) the allegation that Duke employees interrogated Mr. Fleming while he was detained. Each of these allegations must be evaluated in light of the evidence that is actually in the record.

Before turning to the specific allegations, it is important to note that the Duke Defendants have a duty to report any suspicious activity in the area around the Plant to specified federal authorities and local law enforcement, which they did in this case. There is no requirement that conduct be illegal for it to be considered suspicious and reported. Moreover, the Duke Defendants have a duty to investigate suspicious instances, and, depending on their findings, to submit reports to federal regulatory authorities.[8] These duties arise from federal regulatory law, and to treat actions taken in

---

[8] It is not difficult to imagine that federal authorities and regulators might seek information about suspicious flight activity as well as the identity and activities of the pilot, regardless of whether a crime was committed. For example, the federal agents who interviewed Mr. Fleming appeared to be particularly interested in whether he had taken photographs of the Plant. (*See* ECF No. 135-8 at 4-5.) In short, one

compliance with these federally-imposed responsibilities as "state action" would not be appropriate. *See, e.g.*, *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 658 (4th Cir. 1998) ("To the extent Dowe contends that TAP is funded and regulated by the federal government, she is really making the case that TAP was acting under the color of federal law. If so, the claim should have been brought under *Bivens v. Six Unknown Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), rather than § 1983.") (abrogated on other grounds). If the Duke Defendants had seized Mr. Fleming, ordered state law enforcement to seize him, used any force against him, sought to have him prosecuted, or otherwise exercised power analogous to that of the state against him, this would likely be a different case.

The Court does not find that the conduct cited by Plaintiff is sufficient to warrant treating the actions of the Duke Defendants as the actions of the state. First, Plaintiff has not shown any direct link between training conducted by the Duke Defendants and the law enforcement response in this case. If there is evidence supporting the theory that the Duke Defendants, during a previous training session, provided the Darlington County Sheriff's Department with inaccurate information on how this specific situation ought to have been handled, that theory has not been adequately developed to allow it to be presented to a jury. The only evidence Plaintiff cites is a very short passage from the deposition of Mitchell Lynch indicating that Duke provides some training to law enforcement and participates in joint drills with them from time to time. (ECF No. 144-53.) This is simply insufficient to convert the Duke Defendants into state actors.

---

cannot assume that the motivation for Duke security personnel to investigate Mr. Fleming's flight would be to aid state authorities in arresting and prosecuting him.

Second, Plaintiff directs the Court to an internal Duke email sent at 5:39 p.m. on the evening of July 26, 2012, which reads as follows:

> The control room was contacted by Security personnel regarding an unidentified airborne craft in the area near the plant. Further investigation and monitoring identified the craft as a glider. The tail number has been obtained by a security officer stationed in one of the BRE towers. This information has been forwarded to Darlington County Law enforcement to assist in determining the crafts [sic] origin in an effort to capture and detain the individual for further questioning. The individual has been apprehended at the Hartsville airport by local law enforcement personnel.

(ECF No. 144-33.)

Here is how Plaintiff characterizes this email in its submission to the Court: "In an internal email, Duke indicated that it had contacted the Darlington County Sheriff's Department and requested that it capture and detain Mr. Fleming." (ECF No. 144 at 8.) The email above simply does not say what Plaintiff maintains it says. There is no "request" from the Duke Defendants that local law enforcement "capture and detain" Mr. Fleming. A fair reading of this email is that the Duke Defendants forwarded information to local law enforcement officers who were *themselves* seeking to capture and detain Mr. Fleming and ultimately did capture and detain him. However, even if a jury could reasonably disagree with this interpretation of the email, Plaintiff has not directed the Court to any other steps that the Duke Defendants took that can be fairly characterized as an attempt to "capture or detain him." The record makes it abundantly clear that it was the Darlington County Sheriff's Department that captured and detained Mr. Fleming, not Duke.

Third, the fact that Duke security personnel travelled to the Hartsville Airport where Mr. Fleming was arrested is fairly unremarkable because they clearly had an interest in determining who was operating the aircraft, the purpose for which it was

being operated, and whether there was any ongoing threat to the security of the Robinson Plant. Indeed, if local law enforcement had determined that they were going to arrest the operator of the aircraft, it would be odd for security personnel from the Robinson Plant not to go to the scene to see what else could be learned about the situation. Private security officers do not become state actors simply by being at the scene of an arrest or seizure. *See Sanders v. City of Minneapolis, Minnesota*, 474 F.3d 523, 527 (8th Cir. 2007) (security guard employed by private college who followed a vehicle being driven erratically and blocked it in an alley was not a state actor for purposes of a lawsuit brought by driver's family after driver was killed by responding police officers).

Fourth, the claim that Duke security personnel assisted law enforcement in convincing Ms. Griffin to order Mr. Fleming to land is simply not supported by the record. Plaintiff's counsel appears to have filed Ms. Griffin's affidavit out of order, switching pages 3 (¶¶ 4-9) and 4 (¶¶ 9-16). (*See* ECF No. 144-12.) That the affidavit was filed out of order is not only confirmed by the paragraph numbers, but by the fact that ¶ 4, which begins at the bottom of page 2, continues at the top of page 4. When the pages and paragraphs are read in proper order, it appears that Ms. Griffin had already argued with the Sheriff's deputies (¶ 4) and conveyed to Mr. Fleming the Sheriff's instruction that he land his glider (¶ 5) before Duke security personnel even arrived (¶ 11). While Ms. Griffin alleged that "[n]uclear plant personnel at the airport appeared to work in concert with Darlington County Sheriff's deputies throughout the incident" (¶ 16), she also indicated that she "felt coerced by *law enforcement*" to order Mr. Fleming to

land (¶ 5), but did not allege that anything she heard from Duke security personnel influenced her decision to convey the instruction to Mr. Fleming.

Fifth, the fact that Duke security personnel inspected or photographed Mr. Fleming's glider does not convert their actions into the actions of the state. It is not as if the Darlington County Defendants would have had to let Duke security personnel board the aircraft to see inside the cockpit. As previously noted, the cockpit of the glider is very small, and with the hatch open, the entirety of the cockpit could be seen by anyone standing nearby. Moreover, there is no evidence that the Duke Defendants were involved in seizing items from the glider or taking an inventory of the glider, which tasks were completed by deputies of the Darlington County Sheriff's Department. (*See* Incident Report, ECF No. 144-8 at 4.) Again, the conduct of Duke security personnel is consistent with the goal of gathering information about Mr. Fleming and the motivation for his flight, and not with gathering evidence to support an arrest or prosecution.

Sixth, Plaintiff points to the fact that Duke employees interrogated Mr. Fleming as evidence that they were acting as the state. Plaintiff maintains that there is a factual dispute over whether Mr. Fleming consented to speaking with the Duke security personnel who questioned him. However, Mr. Fleming's response does not actually appear to be disputed. When he was asked if he would answer questions from members of Duke's security team, he replied that "it depended on what the questions were." (ECF No. 135-8 at 3.) While this is not a commitment to answer the questions, it is consent for questions to be asked, as his response implies that he would determine whether to answer after hearing the substance of any given question. In any event, Duke security personnel asked him a single question about whether he knew that the

Robinson Plant was a nuclear facility, to which he responded that he did. This hardly represents a police-style interrogation.

As illustrated above, in one instance after another Plaintiff fails to distinguish between the actions of the Duke Defendants and the Darlington Defendants in support of its argument that the Court should treat the Duke Defendants as if they were the Darlington Defendants. If the Duke Defendants were strictly private actors with no separate *federal* obligations to report and investigate suspicious activity near the plant, this would be a much closer case. However, given that the Duke Defendants had legitimate reasons to investigate Mr. Fleming's flight that were separate from the state's apparent interest in apprehending and prosecuting him, the Court cannot characterize their actions as those of the state.

Finally, Plaintiff argues that the fact that some of Duke's security personnel are deputized weighs in favor of treating Duke's activities as those of the state. However, if the Court were to find that the Duke Defendants acted under color of state law on this basis, the result would not necessarily be beneficial for Plaintiff. In *Rodriguez*, the Fourth Circuit found that a defendant acting as "an auxiliary deputy sheriff" at the time he arrested the plaintiffs fell within the scope of a release the plaintiffs executed waiving their claims against the sheriff's department. *See* 338 F.3d at 355 ("The problem for plaintiffs, however, is that once we find that Priest was acting under color of state law when making the arrests, he is covered by the release and cannot be sued by Ward or Rodriguez.").

### III.    State Law Claims Against the Duke Defendants

Plaintiff advances state law claims against the Duke Defendants for negligence, false arrest, and civil conspiracy. The Duke Defendants argue that these claims are preempted by the Atomic Energy Act of 1954, 42 U.S.C. § 2011 *et. seq.* ("AEA"), and the Energy Reorganization Act of 1974, specifically 42 U.S.C. § 5841, which established the Nuclear Regulatory Commission (NRC).

Under the Supremacy Clause, Article VI, Clause II of the United States Constitution, state law that conflicts with federal law is of no effect and the applicable federal law controls. Federal law may supersede state law in three different ways: (1) when Congress expressly preempts state law by so stating in express terms, (2) where a scheme of federal regulation is sufficiently comprehensive to invoke a reasonable inference that Congress left no room within the field for supplementary state regulation, and (3) where federal and state law actually conflict. *See California Federal Sav. and Loan Ass'n v. Guerra*, 479 U.S. 272, 280-81 (1987). The third category, so called "conflict" preemption, may arise either because "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-143 (1963), or because the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

"[T]he federal government has occupied the entire field of nuclear safety concerns, except the limited powers expressly ceded to the states." *Pacific Gas and Elec. Co. v. State Energy Resources Conservation & Dev. Commn.*, 461 U.S. 190, 205 (1983). Accordingly, while states may "exercise their traditional authority over the need

for additional generating capacity, the type of generating facilities to be licensed, land use, ratemaking, and the like," federal authorities "maintain[] complete control of the safety and 'nuclear' aspects of energy generation." *Id.* at 212. To determine whether a state-law tort claim is preempted, a court must consider whether the claim "is so related to the 'radiological safety aspects involved in the . . . operation of a nuclear facility that it falls within the pre-empted field." *English v. Gen. Elec. Co.*, 496 U.S. 72, 85 (1990).[9] "[F]or a state law to fall within the pre-empted zone, it must have some direct and substantial effect on the decisions made by those who build or operate nuclear facilities concerning radiological safety levels." *Id.*

Like the *English* Court, this Court rejects the argument "that the pre-empted field of 'nuclear safety' is a large one." *See* 496 U.S. at 82-83. What is implicated by this case is a narrow area of discretion, namely the ability of officials at nuclear facilities to assess activity in the airspace around a facility, to evaluate whether that activity is suspicious or concerning, to report that activity to federal and local law enforcement, and to follow up to determine what, if any, risk was or is posed to the facility by the activity. Still, the Court finds that, if they were allowed to proceed, Plaintiff's claims in

---

[9] In a sharply worded response, Plaintiff accuses the Duke Defendants of intentionally misconstruing the holding in *Pacific Gas* by failing to discuss the Supreme Court's 1988 ruling in *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238 (1984):

> In arguing that *Pacific Gas* stands for the proposition that state tort law is preempted, Duke ignores the more recent holding in *Silkwood* that is precisely on point. Duke's ignorance or willful blindness as to *Silkwood* makes their pre-emption claim frivolous and irrelevant. Their argument is disingenuous when they knew or should have known that the Supreme Court held in *Silkwood* that state law tort claims and punitive damages are allowed and not preempted by the Atomic Energy Act and its subsequent amendments.

(ECF No. 144 at 11.) The Court, however, agrees with Defendants that *Silkwood* rested primarily on a specific finding "that Congress assumed that persons injured by nuclear accidents were free to utilize existing tort law remedies." *Silkwood*, 464 U.S. at 251-52; *see English*, 496 U.S. at 86 (observing that "*Silkwood* was based in substantial part on legislative history suggesting that Congress did not intend to include in the pre-empted field state tort remedies for radiation-based injuries"). This Court also agrees with the Duke Defendants that the Supreme Court's holding in *English*, which the Duke Defendants cite and discuss in their memorandum in support of summary judgment, states the controlling test.

this case would have a direct and substantial effect on security decisions concerning radiological safety levels by those charged with operating nuclear facilities.

More specifically, the liability Plaintiff seeks to impose upon the Duke Defendants would undoubtedly affect the manner in which potential security threats are perceived, evaluated, and reported to law enforcement. Indeed, the injunctive relief sought by Plaintiff makes it abundantly clear that this is one of the primary goals of this litigation. (*See* Am. Compl. 24-25, ECF No. 118 (seeking an order "requiring . . . Defendants . . . to develop and implement a program to properly educate their employees and agents regarding aircraft operations, airspace classification, safety, and aviation security in a manner that is acceptable to national aviation organizations such as the Aircraft Owners and Pilots Association and the Soaring Society of America").) These are matters upon which federal regulators have provided very specific guidance. Without discussing the specifics of the NRC guidance that the Duke Defendants submitted to the Court under seal, the Court finds that the Duke Defendants followed the applicable guidance in their response to a flight they considered suspicious, and that they considered the flight suspicious for reasons that were generally consistent with the guidance. (*See* ECF No. 166 at 5, 8-9, 13 & 16.) Again, it is important to note that a flight need not violate FAA regulations to be considered suspicious and to warrant security officials at a nuclear facility contacting law enforcement. If there was ever a venue at which we should hope security personnel consider themselves better safe than sorry, a nuclear generation plant is that venue.

Lest Plaintiff fear that the Court is creating an opportunity for security personnel at nuclear facilities to harass with impunity civilian aircraft lawfully operating in the

airspace around such facilities, the Court wishes to emphasize the limited nature of its ruling. This would be a very different case had the Duke Defendants attempted to shoot down Mr. Fleming's glider, seized Mr. Fleming, ordered him to land, or taken any other steps to physically interfere with his flight or seize his person. The conduct this decision insulates involves the manner in which nuclear operators assess and evaluate activity as suspicious or non-suspicious and report that activity to law enforcement. Such operators should be able to rely on state and local authorities to know the law, to independently make determinations about the activity reported, and to respond within the bounds of their lawful authority. To hold such operators liable for tortious actions law enforcement may take in response to their reports would have a direct and substantial impact on judgments that Congress intended these operators to make exclusively in accordance with guidance from federal authorities, such as the NRC.

Plaintiff would likely object that his claims involve not only the reasonableness of the judgments made by the Duke Defendants, but also the accuracy (or inaccuracy) of the information they conveyed to law enforcement regarding the altitude of Mr. Fleming's glider and his reported flight path. (*See* ECF No. 144 at 3.) However, to allow Plaintiff to proceed on such a theory would have a similarly direct and substantial impact on the readiness or reticence of nuclear facility security personnel to convey their observations to law enforcement. The NRC has apparently not seen fit to require such personnel to become experts in differentiating between various types of aircraft, judging distance and altitude, or describing a flight path in a detailed manner. However, it is neither for Plaintiff nor this Court to dictate how such personnel are trained when Congress has delegated these decisions to a specific federal entity. In the absence of

any evidence that the Duke Defendants intentionally or maliciously conveyed inaccurate information to the authorities, the Court concludes that such a theory of liability is preempted because it would have a direct and substantial impact on the willingness of security personnel at nuclear facilities to describe what they think they see when they see it. Allowing nuclear facilities to be held liable for non-malicious inaccuracies in the reports of their security personnel in the midst of rapidly developing situations would unquestionably affect the balance between accuracy and precision on the one hand and candid, contemporaneous reporting on the other. For good reasons, this is a balance that Congress has left to federal regulators.

## CONCLUSION

In conclusion, the Court is sympathetic to the position of Mr. Fleming and his estate. From the record before the Court it appears that he should not have been ordered to land or arrested. The Court does not wish to suggest for a moment that it is sanctioning the response of the Darlington County Sheriff's Department or that the law excuses their exercise of authority beyond their jurisdiction. On the other hand, Mr. Fleming waived his rights against these defendants in return for having very minor charges against him dropped, and the Darlington Defendants have carried their burden to show that the waiver is enforceable. While Plaintiff has attempted to raise suspicion around Mr. Fleming's defense counsel, the Court is not convinced that he acted unethically or unreasonably in recommending that Mr. Fleming draft and execute a release-dismissal agreement. Plaintiff has not directed the Court to facts or circumstances that meaningfully distinguish this case from others where courts have

upheld similar waivers. Accordingly, the Darlington Defendants are entitled to summary judgment, and their motion for the same (ECF No. 141) is **GRANTED**.

The Duke Defendants' motion for summary judgment must also be granted. The Duke Defendants were not state actors for the purposes of § 1983 because they were not responsible for the state's actions in ordering Mr. Fleming to land, arresting him, and charging him with breach of the peace. While the presence of Duke security at the airport, the fact that they asked Mr. Fleming a question, and the fact that they looked in his glider would otherwise make this a close case, the reality that the Duke Defendants had a separate federal obligation to investigate the circumstances surrounding a flight they deemed to be suspicious weighs against construing their actions as those of the state. Moreover, state law causes of action against the Duke Defendants for reporting Mr. Fleming's flight to local law enforcement are preempted by federal law. It is not for this Court or Plaintiff to determine what the Duke Defendants may reasonably consider to be suspicious and what they may or may not report to federal or local law enforcement. A party with a federally imposed duty to report certain conduct to local law enforcement cannot be held liable simply because local law enforcement subsequently overreacts. Accordingly, the Duke Defendants' motion for summary judgment (ECF No. 135) is **GRANTED**.

**IT IS SO ORDERED.**

/s/Bruce Howe Hendricks
United States District Judge

March 31, 2016
Greenville, South Carolina

33